**Burrows v. SSA**                    **CV-04-145-PB  04/25/05**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Debra A. Burrows</u>

    v.                                        Civil No. 04-CV-145-PB
                                                Opinion No. 2005 DNH 071
<u>Jo Anne Barnhart, Commissioner,</u>
<u>Social Security Administration</u>


<u>MEMORANDUM AND ORDER</u>

On May 31, 2002, Debra Burrows filed applications with the Social Security Administration ("SSA") for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Burrows alleged that she had been unable to work since April 30, 1999. The SSA denied her applications and granted her request for a hearing by an Administrative Law Judge ("ALJ"). On May 6, 2003, ALJ Ruth Kleinfeld held a hearing and, in an opinion dated January 30, 2004, denied Burrows' applications.

Burrows brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "Act") seeking review of the denial

of her applications for benefits. Burrows first argues that the ALJ failed to adequately support her determination that Burrows' allegations of disability were not credible. She next argues that the ALJ erred by not fully developing the record. For the reasons set forth below, I disagree with both assertions.

## I. BACKGROUND[1]

### A. Education and Work History

Debra Burrows was 44 years old when her social security applications were denied by the ALJ in January 2004. Transcript of Record ("Tr.") 16, 21. Burrows, a high school graduate, worked as a certified nurse's aide ("CNA") for eight years. Tr. 16, 78. She left her last job as a caretaker and house cleaner for elderly individuals on April 30, 1999. Tr. 29-30, 77-78.

### B. Medical History

Burrows began feeling feverish after her last day of work. Still suffering from a fever, she went to Frisbie Memorial Hospital on May 5, 1999. Tr. 131. The examining physician noted

---

[1] Unless otherwise noted, the background facts are taken from the Joint Statement of Material Facts submitted by the parties. (Doc. No. 6).

that Burrows had a history of recurrent cellulitis.[2]  Tr. 131. Burrows was treated with antibiotics until her fever abated.

Burrows returned to the hospital approximately a month later, after developing pain in her right hip that worsened when she moved.  She was diagnosed with osteomyelitis of the right proximal femur and mild chronic inflammation of the soft tissue.[3]  Tr. 126.  She later underwent physical therapy, during which her internal and external hip rotation and weight bearing capacity were found to be limited.  Burrows nevertheless reported that her right hip pain improved dramatically during her hospital stay and she was discharged on August 3, 1999.

On four follow-up visits between August 12 and December 21, 1999, Dr. Kalter noted that Burrows was increasingly mobile.  At her second follow-up visit, Burrows reported that she could walk

_____

[2]  Cellulitis is an acute, diffuse, spreading, edamatous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, which may be associated with abscess formation. It is usually caused by infection of an operative or traumatic wound, burn, or other cutaneous lesion by various bacteria, but Group A Streptococci and Staphylococcus aureus are the most common etiologic agents.  Dorland's Illustrated Medical Dictionary ("Dorland's") 295 (28th ed. 1994).

[3]  Osteomyelitis is an inflammation of the bone marrow and adjacent bone.  Stedman's Medical Dictionary ("Stedman's") 1284 (27th ed. 2000).

up stairs on her own and enter, exit, and ride in a car. Two weeks later, Burrows was able to walk with a cane. At Burrows' fourth follow-up, Dr. Kalter noted that she had surprisingly good range of motion in her hip and was able to bear full weight with only moderate pain.

Burrows was admitted to the hospital again on May 25, 2000 with a high fever, leukocytosis, and redness and swelling of the left leg. Her left lower extremity evolved into edema[4], erythema[5], tenderness, ulcers, and eventually bullous[6] lesions of the cutaneous tissue. Dr. Hodge ruled out a diagnosis of deep venous thrombosis and noted probable venous stasis disease. Tr. 151. Although Burrows' condition improved during her six-day hospital stay, Dr. Hodge nevertheless noted that Burrows was at continued risk for recurrent cellulitis given her obesity. Tr. 144.

Burrows was hospitalized again on June 6, 2000 for swelling, tenderness, and warmth in her left foot and ankle. She remained

_____

[4] An accumulation of watery fluid in cells or tissue. Stedman's at 566-567.

[5] Redness due to capillary dilation. Stedman's at 615.

[6] Like a blister or vesicle. Stedman's at 257.

hospitalized for just over two weeks for unresolved cellulitis. Tests revealed mild venous reflux in her left leg, as well as post-traumatic arthritis of the left ankle. During a follow-up visit on December 19, 2000, Dr. Kalter noted that Burrows had a loss of internal rotation, but that she was able to walk with a mild Trendelenburg gait without the use of a cane.[7]

Burrows was hospitalized yet again on June 23, 2001 when swelling, pain, and redness returned in her right leg. She was discharged five days later after treatment with intravenous antibiotics.

Burrows entered the hospital for a fifth time on November 25, 2001. This time she remained for more than a month. An x-ray revealed osteoarthritis of the right hip with spurring, narrowing, and sclerosis. She was also treated for cellulitis and increased pain and swelling in the left lower extremity. During follow-up visits in January and February 2002, Dr. Hodge and Dr. Hayter noted that Burrows was capable of moving about and walked well without a cane. Dr. Hodge also noted that Burrows reported that she was doing well and had no pain in her leg.

---

[7] A side lurching of the trunk over the stance leg due to weakness in the gluteus medius muscle. Stedman's at 1640.

-5-

Burrows was hospitalized again for twelve days on July 14, 2002 with cellulitis in her left leg.  Tr. 253.  Her cellulitis again initially resolved with the use of intravenous antibiotics.  On September 8, 2002, however, Burrows was hospitalized for three days with recurrent cellulitis, and on November 26, 2002, she returned for four days after developing soreness in her right leg.  During the November hospitalization, Dr. Edwards noted that the cellulitis in her right leg was related to venous insufficiency, obesity, prediabetes, and psoriasis.  In a section of his report labeled "social history," Dr. Edwards stated that Burrows was "totally disabled" and could only ambulate short distances in the home.

On September 5, 2002, Dr. Cataldo, an agency program physician, reviewed Burrows' medical records and completed a residual functional capacity ("RFC") assessment.  Tr. 224, 232.  Dr. Cataldo stressed that Burrows' primary care physician, Dr. Stacey, had noted that Burrows' most recent bout of cellulitis was "well-healed."  Tr. 230.  Dr. Cataldo explained that Burrows' conditions of recurrent cellulitis and chronic venous stasis supported a reduced functional capacity, but that the limitations Burrows complained of were not supported by the objective medical

-6-

evidence. Tr. 230.

Burrows began physical therapy on December 30, 2002, as recommended by Dr. Hayter. During a month of physical therapy, Burrows was educated about appropriate skin care for cellulitis and edema and was taught how to use bandages and compression stockings. Tr. 240.

Burrows initially took narcotics to manage her pain after her surgery in June 1999. She switched her medication to Ultram on September 2, 1999. Tr. 133. By December 21, 1999, however, Burrows was taking only Motrin for pain. Tr. 137. Medical records and Burrows' testimony indicate that by May 2000, she was taking Tylenol or Ibuprofen for pain. Tr. 150, 33.

## C. **Burrows' Testimony**

At the May 6, 2003 hearing, Burrows answered her attorney's questions and testified that she could not work as a caretaker because she could only stand for fifteen minutes at a time. Tr. 30. Burrows also testified that she had very little mobility from August until December 1999, and that she therefore used either a wheelchair or a walker during that period. Tr. 32. Burrows additionally reported that she could not climb stairs and that she did not do any household chores during that time period.

Tr. 35.

Burrows attended the hearing in a wheelchair and testified that she used a wheelchair or a rider cart every time she went out of the house to travel a walking distance. Tr. 30. Burrows testified that she felt good in between bouts of cellulitis and that she helped with household chores when she could use her wheelchair while doing those chores. Tr. 37.

Burrows testified that her daily activities included knitting or crocheting for two to three hours while sitting. Tr. 38. She also testified that she was able to sit and work at a computer. Tr. 39. Burrows testified that she was stiff when she stood up after sitting for any length of time. Tr. 36.

## D. **Vocational Expert's Testimony**

Vocational expert ("VE"), Ralph Richardson, classified Burrows' past work as a CNA as medium, semi-skilled, and her work as a caretaker as medium, unskilled work. Tr. 40-41. Richardson testified that Burrows' RFC permitted only light or sedentary work and thus she could not perform her past relevant work. Tr. 41. He also identified a number of light or sedentary jobs with a sit/stand option that would allow Burrows to elevate her leg.

Richardson found that even with her limitations, Burrows could nevertheless work as an assembler (885,500 national positions), cashier (1,600,300 national positions), order clerk (268,000 national positions), or sorter (655,000 national positions). Tr. 41-43.

**E.    The ALJ's Decision**

The ALJ denied Burrows' disability applications because she found that although Burrows suffered from a medical impairment, she could perform a substantial number of jobs in the national economy. Tr. 19. The ALJ followed the five-step sequential analysis to reach her decision. See 20 C.F.R. § 404.1520 (2005). The ALJ determined that Burrows: (1) had not engaged in substantial gainful activity since April 30, 1999; (2) had severe medical impairments including post-osteomyelitis, venous insufficiency, hypertension, diabetes, and obesity; but that (3) her impairments did not meet or equal a listed impairment; and (4) although her impairments prevented Burrows from performing her past relevant work as a CNA or a caretaker; (5) her impairments did not prevent Burrows from doing other gainful work. Tr. 19-20.

The ALJ thoroughly reviewed Burrows' medical records to determine that her impairments did not meet or equal any listed impairments. Tr. 17-18. The ALJ also found that Burrows' impairments did not meet the 12-month continuous standard required for a finding of a disability. Tr. 16. The ALJ further found that Burrows' physicians' descriptions did not support the conclusion that Burrows was unable to work. Tr. 17. In so holding, the ALJ referred briefly to Dr. Edwards' report, which the ALJ claimed described Burrows' medical history in a manner similar to the way it was described in the ALJ's opinion. The ALJ then found that the medical record was consistent with the agency program physician's RFC assessment, which concluded that Burrows could perform a full range of sedentary work and a limited range of light work. Tr. 18.

Based on the RFC assessment, the VE stated that although Burrows could not return to her past work, she could perform other occupations, even given the additional limitation of needing to elevate her legs. Tr. 18-19. The ALJ concluded that this testimony was consistent with the medical record, and thus found that Burrows' assertions of disability lacked credibility. Tr. 18-19.

## II.  **STANDARD OF REVIEW**

Under the Act, the factual findings of the ALJ are conclusive if supported by "substantial evidence."  See 42 U.S.C. § 405(g); Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  I therefore must uphold the ALJ's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The ALJ's decision is supported by substantial evidence if, given all the evidence, it is reasonable.  Additionally, it is the function of the ALJ, and not the courts, to determine issues of credibility, to draw inferences from the record evidence, and to resolve conflicts in the evidence.  Ortiz, 955 F.2d at 769.

The ALJ's findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  If the Commissioner, through the ALJ, has misapplied the law or failed to provide a fair hearing, deference to the Commissioner's decision is not appropriate, and remand for further development of the record may be necessary.

See <u>Seavey v. Barnhart</u>, 276 F.3d 1, 11 (1st Cir. 2001). I apply these standards to the arguments Burrows raises in her appeal.

### III. <u>ANALYSIS</u>

Burrows argues that the ALJ failed to base her conclusion regarding Burrows' credibility on substantial evidence and that she failed to explain her decision in sufficient detail. She also argues that the ALJ failed to properly consider relevant medical evidence and that she should have requested additional evidence in order to reach an adequately informed decision. For the reasons set forth below, I reject Burrows' claims and affirm the ALJ's decision.

### A. <u>ALJ's Assessment of Burrows' Credibility</u>

In determining the credibility of a person's statements, an adjudicator must consider the entire record, which includes the objective medical evidence, the individual's subjective statements about symptoms, information provided by medical specialists, and any other relevant evidence in the record. <u>See</u> Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1 (1996); <u>Avery v. Sec'y of Health & Human Servs.</u> 797 F.2d 19, 21

(1st Cir. 1986). So long as a credibility determination is supported by the evidence, the ALJ's determination is entitled to deference since she observed the claimant, evaluated the claimant's demeanor, and considered how the claimant's testimony corresponded with the rest of the evidence. Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

In addition to being based upon substantial evidence, an ALJ's evaluation of a claimant's credibility must be supported by specific findings. See Machos v. Apfel, 2000 D.N.H 139, 2000 U.S. Dist. LEXIS 9105, at *16-17 (D.N.H. 2000); Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998). "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' . . . [the decision] must be sufficiently specific to make clear . . . the weight given to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2.

In concluding that Burrows' allegations of her disability were not credible, the ALJ cited the evidence that she relied on in making her determination. Though Burrows testified that she

had problems walking any distance, that she therefore needed to use a wheelchair, and that she could not climb stairs after her hip surgery in June 1999, her medical records reveal that Burrows was walking up stairs on her own in September of that year. Tr. 133. Additionally, notes from a four-month follow-up to her hip surgery indicate that Burrows was walking then without a cane. Tr. 138. Doctors continued to note that Burrows was able to walk without a cane in June 2000, December 2000, and February 2002. Tr. 139, 141, 207. Doctors also noted during follow-up visits that Burrows still had good range of hip and ankle motion (the specific areas affected by osteomyelitis and cellulitis). Tr. 137, 150, 173. The ALJ concluded on the basis of this evidence that Burrows was not credible because her testimony regarding her limitations conflicted with the medical record and with the RFC assessments that were based upon those medical records. Tr. 19.

The ALJ specifically stated in her opinion that Burrows' subjective complaints were not credible because Burrows was not significantly limited in her daily living activities. Tr. 18-19. This credibility determination was also supported by internal inconsistencies in Burrows' testimony. For instance, at her hearing Burrows testified that she could not sit for any length

-14-

of time without getting stiff.  Burrows also testified, however, that she could sit for two to three hours while knitting or crocheting, and her medical records indicate that she was able to take a long car trip about three months after her surgery.  Tr. 133.  This evidence further suggests that it was reasonable for the ALJ to determine that Burrows' testimony was not credible and that Burrows was in fact capable of sitting and performing sedentary work.  The record therefore contains sufficient evidence to support the ALJ's credibility determination.

**B.  ALJ's Consideration of Relevant Medical Evidence**

Burrows also claims that the ALJ erred in failing to solicit additional evidence from her treating physicians concerning her residual functional capacity.  Burrows' strongest argument on this point is that additional evidence was needed because Dr. Edwards stated in his report that Burrows was "totally disabled," and none of her other treating physicians performed a formal assessment of her residual functional capacity.

I am not persuaded that the ALJ erred in failing to further develop the record.  First, Burrows was represented by counsel at the hearing before the ALJ.  Accordingly, the ALJ's duty to seek

out supplemental evidence was not the same as it would have been in a case where the claimant was unrepresented. Second, Dr. Edwards' statement that Burrows was totally disabled is a report of her social history rather than an opinion concerning her medical condition. As such, it is cumulative of Burrows' testimony at the hearing concerning her functional limitations. Third, although none of Burrows' treating physicians made a formal assessment of her functional capacity, they did produce detailed records concerning her medical condition and these records were used initially by Dr. Cataldo and ultimately by the ALJ in assessing her functional capacity. Under these circumstances, the ALJ did not err in failing to seek additional medical evidence from Burrows' treating physicians.

_____

## IV. CONCLUSION

Since I have determined that the ALJ's denial of Burrows' benefits was supported by substantial evidence, I affirm the Commissioner's decision. Accordingly, Burrows' Motion to Reverse (Doc. No. 4) is denied, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 5) is

granted.  The clerk shall enter judgment accordingly.

SO ORDERED.


_____
Paul Barbadoro
United States District Judge

April 25, 2005

cc:  Vickie S. Roundy, Esq.
     David L. Broderick, Esq.